ISABELLA EVANS, plaintiff in error, *vs.* RICHARD D. ARNOLD *et al.*, defendants in error.

1. Where an executor had proven a will in common form, upon the oath of one of the witnesses, and one of the heirs at law called upon him, by motion in writing, duly served, to appear before the ordinary, and show cause why said probate should not be set aside, on the ground that the testatrix, at the making of the pretended will, was not of sound mind, and was under undue influence, etc.; and the executor appeared and propounded the will, and the same was set up as the last will by the ordinary, and there was an appeal to the superior court, and the cause came on for trial:

*Held*, that the proceeding was substantially a proceeding to prove the will in solemn form, as to all who were parties thereto, or had notice thereof; that the executor had the opening and conclusion of the case, and was bound to produce or account for the absence of all the witnesses to the will.

2. In the probate of a will, the burden of proof is upon the propounder to show all the facts necessary to make a good will, and this includes not only the fact of execution, but that the will is the free act of a man competent, under the law, to make a will.    The heirs of a deceased person take his estate, by virtue of the statute of distributions, and their rights can only be divested by proof that the deceased died, leaving a will, by him freely executed according to the forms of law, whilst he was of sound mind.

3. What shall be the extent of the proof of sanity and freedom, must depend upon the circumstances of each case; ordinarily, the opinion of the subscribing witnesses, from what they have seen and know, at the time of execution, that the testator was sane and free, will make a *prima facie* case; but if from all the testimony the jury is not satisfied that the testator was of sound and disposing mind, and that the will is his free act, probate should be refused.

4. On the propounding of a will, where the question is insanity, monomania, or undue influence, the unreasonableness of the disposition of the will, is always a question to be considered by the jury; and where a testatrix, who was in extreme old age, had several children, one of whom was an idiot daughter, and she left the whole of an estate of $20,000 00 to certain trustees, who were of no kin to her, for the maintenance of the idiot girl for life, and at her death, to the trustees in fee, to the entire exclusion of her other children, some of whom were poor, and on a *caveat* to the will, one of the grounds taken was that the testatrix was a monomaniac as to her excluded children, which ground was sustained by the evidence of various witnesses:

*Held*, that it was error in the court to charge the jury that if they should find the testatrix to be a monomaniac as to such excluded children, and should also find that her anxiety to provide for her idiot child was natural and just, it did not concern them as to whether the mode she took so to do was wise and proper; such a charge was calculated to withdraw from the consideration of the jury the fact patent upon the face of the will, that the fee in the whole estate was given to strangers, which fact, if the testatrix was a monomaniac as to her excluded children, was a proper matter to be considered in determining whether the will was the result of her monomania.

Wills. Probate. Monomania. Insanity. Order of argument. *Onus probandi.* Before Judge SCHLEY. Chatham Superior Court. May Term, 1872.

On the 5th April, 1867, Isabella Evans petitioned the court of ordinary of Chatham county to set aside the probate in common form of a paper purporting to be the last will and testament of Esther Goldsmith, upon the grounds that, at the time of its alleged execution, she was incompetent to make a will; that the will was the result of monomania, and had been procured from her by the misrepresentations, fraud and undue influence of the propounders, and by mistake, upon her part, as to the conduct of the heirs-at-law. On May 6th, 1867, the ordinary, after hearing the case, "ordered, adjudged and decreed that the said several grounds of objection are overruled, and that the said will propounded is the will, duly proved, of the testatrix, Esther Goldsmith."

From this judgment of the court of ordinary an appeal was duly taken to the superior court of Chatham county; and, upon the hearing of the said cause, Richard D. Arnold and

Evans *vs.* Arnold *et al.*

Andrew M. Ross proceeded to propound the will in the usual form, examining two of the attesting witnesses, and were about to read the paper to the jury, when counsel for caveatrix objected, for the reason that only two witnesses had been examined, and the third witness had not been accounted for. The court overruled the objection, saying that the proceeding was not a probate of the will in solemn form, and that, therefore, it was not necessary to produce or account for all the subscribing witnesses; to which ruling counsel for caveatrix excepted. But thereupon claimed that, under this ruling of the court, the caveatrix was entitled to the opening and the conclusion of the case. This claim was also overruled; and counsel again excepted. The will was read to the jury. At no stage of the trial was the third attesting witness either produced or accounted for.

This instrument left all of her estate to her friends, Richard D. Arnold and Andrew M. Ross, of the city of Savannah, to have and to hold the same in trust for her idiotic daughter, Henrietta, for and during the term of her natural life, the income and profits thereof, or so much as may be necessary, to be appropriated for her liberal maintenance, and proper care and protection, and commended her said daughter to their particular care and kindness, and from and after the death of her said daughter, gave said entire estate to the said Arnold and Ross, to be equally divided between them, to have and to hold the said estate to them and their heirs and assigns, freed and discharged from any and all trusts whatsoever.

The propounders having closed, Mr. Solomon Cohen was presented as a witness for caveatrix. During the course of his examination he stated that he filled the chair of medical jurisprudence in the Savannah Medical College; that it had come into the line of his duty to study, and to lecture upon, the subject of the mind; that he had devoted a good deal of time and study to the subject of insanity; that he thought he understood it pretty well, and had seen and noticed many cases of it; that he had known Esther Goldsmith for many

years, and had been thrown into confidential relationship with her.

Thereupon counsel for caveatrix requested him to express his opinion as an expert in regard to the soundness of her mind. Counsel for propounders objected; the objection was sustained, and counsel for caveatrix excepted.

Counsel for caveatrix complained of error in the charge of the court upon the following grounds:

1st. Because the judge used such language in various places, as clearly indicated to the jury his own views of the facts of the case.

2d. Because he assumed throughout that the execution of the will might have been duly proved to the satisfaction of the jury, when only two of the subscribing witnesses had been produced, and the third was not accounted for.

3d. Because he so charged upon the subject of monomania as to preclude the jury from recognizing evidence of it in the *mode* in which Esther Goldsmith sought to carry out her intention as regarded "her imbecile and idiotic daughter," provided they should find the intention itself to be natural and rational, and intimated that all the evidence, whether to be discovered from such *mode*, or from the testimony of the witnesses, showed mere "eccentricity of *habit* or *thought*," which did not incapacitate her for making a will.

The following was the language of that part of the charge: "You must, in this connection, then, *first* find whether or not the testatrix was a monomaniac, and upon what *particular* subject. If you find that she was not a monomaniac, then all further investigation of this question will be unnecessary. If you find that she was, and on what subject, you must then ascertain whether the will was the result, or offspring, of this delusion. The contents of the will must here engage your attention. What was the object and intention of the testatrix? Who was the object of her bounty? Was her solicitude for her imbecile and idiotic daughter natural or unnatural? Was it or not a delusion, that she should especially provide for this unfortunate daughter, and was her effort so

Evans vs. Arnold et al.

to do the result of a delusion, or the honest attempt to satisfy the natural yearnings of a maternal heart? If you find the motive natural, and founded on facts already existing, and not the fancies of a distempered intellect, then the will cannot be set aside on the ground of monomania. If her intention was a rational one, the mode in which she carried out that intention does not concern you. It is not necessary that her method of carrying out that desire should or should not coincide with your own ideas of what would have been the best mode or manner of disposing of her property, so as most advantageously and successfully to accomplish her purposes, for in the language of our Code, section 2373, eccentricity of habit or thought does not deprive a person of the power of making a testament."

Counsel for caveatrix requested the court to charge as follows:

1st. "That if they found from the evidence, the existence of insanity in one of the children of testatrix, that fact raises a violent presumption of its having existed in herself." The court declined to give this request, saying that "it would be an expression of opinion on the testimony," but proceeded forthwith to add that, "as a principle of law, the court did not recognize it, as it was inconsistent with the common experience of mankind."

2d. "That the rule of evidence in favor of affirmative over negative testimony is a general one, and if they find from the testimony of any of the witnesses, facts which tend to show that the testatrix was insane, such facts are in no wise to be discredited because other witnesses may not have seen the same or like facts."

After reading over the request the court said: "I charge the first sentence of this request as a general rule of evidence. But the evidence with reference to sanity or insanity does not raise this question, and does not resolve itself into positive and negative testimony—the facts showing insanity may be as positive as those showing sanity, and it cannot be assumed that because sanity is the normal condition of the mind that evidence that any one is not sane is negative in its character."

3d. "That the jury are not bound to believe according to the number of witnesses who have testified before them ; but must consider the circumstances in which those witnesses were placed, their means of knowledge, their connection with and relationship to the parties, and, indeed, anything affecting their credibility. But if they find that all of them are unsuspected, and of equal credibility, then they are to believe the larger number rather than the smaller, who are in conflict with them."

The judge struck out the words "they are to believe" and substituted the words "they may believe," saying, "the matter of credibility is left to the jury."

4th. "That the burden of proof is upon the propounders."

The court refused so to charge.

5th. "That the caveatrix being the next of kin, together with others, of the deceased, and as such entitled to the distribution of the estate, if the will fails, the *onus probandi* is on the propounders. They must make out a case by satisfactory proof to prevent the distribution, according to law, of the decedent's estate."

The court said I give you this in charge, but it means as to to the *due execution* of the will.

6th. "That a person may generally appear sensible in the ordinary intercourse and transactions of life, and even reason clearly upon learned and scientific subjects, and yet be the victim of positive derangement."

The court gave this in charge, but interpolated the following words, "but if lucid, when the will is made, or if the will be not the result or offspring of the particular derangement, the will need not be invalid."

7th. "That if they shall find from the evidence that the testatrix was insane at any previous period in her life, such mental state thus proved to have existed, they must presume to continue, unless they also find that it has been rebutted by proof equally strong."

The court refused to charge this, and added : I decline to express any opinion as to proof required, and charge in the

language of the Code, " that a mental state once proved to exist is presumed to continue, but may be rebutted by proof."

8th. " That under the laws of this State, whilst a testator may bequeath his entire estate to strangers, to the exclusion of the next of kin or heirs, yet in such case the alleged will should be closely scrutinized, and upon the slightest evidence of aberration of intellect, or collusion, or fraud, or any undue influence, or unfair dealing, probate should be refused, and that the same rule should be applied, when the bequest or devise is of a large or considerable part of the estate, to the exclusion of child or children."

The court declined to give this charge, and said the latter part of this charge is true as applicable to strangers, but not as between one child and other children.

9th. " That if the jury find that the alleged will of Mrs. Goldsmith was made under a mistake of facts as to the existence or conduct of her heirs-at-law, or any of them, then such will is inoperative as to such heir or heirs, and she shall be deemed to have died intestate as to such heir or heirs."

The court gave this charge with this *addendum:* " The jury must see if there is any evidence of mistake of fact, as otherwise the law does not apply. But that is the law if applicable to the facts before you."

10th. " That if the jury find that Mrs. Goldsmith was generally insane—that is, insane upon all subjects requiring mental capacity—then her alleged will was and is not her will, and that the same result follows if the jury find she was a monomaniac—that is, a maniac in respect to her excluded children; and that, if she was such insane person or monomaniac, the jury must be satisfied that the alleged testament does speak her wishes, unbiased by the mental disease with which she was afflicted."

The court refused to charge as requested, but charged this: "If the jury find that Mrs. Goldsmith was insane on all subjects, and that she had no lucid interval, and that the will was not made in a lucid interval, then the will is void. If they find that she was a monomaniac in respect to her exclu-

ded children, and that the will is the result of or connected with that monomania, then the will is void; but if the will be the expression of a natural desire, and from a particular and peculiar regard for one of her children to the exclusion of the others, and not the result of a delusion, the will is not void on that account. In all such cases it must appear that the testament does speak the wishes of the testatrix, unbiased by the mental disease with which she was afflicted, if you find that she was mentally afflicted."

The only facts necessary to an understanding of the decision were as follows: The age of the testatrix was between eighty and ninety-six at the time of her death. She died in the fall of 1866. The paper sought to be established as her will was executed on August 19th, 1866. She owned property valued at about $20,000 00, yielding an annual income of about $2,200 00. She left four children, one of whom was an idiot, Henrietta, by name, and one a widow, with several children, in impoverished circumstances. Richard D. Arnold was her attending physician at the time of her death. Andrew M. Ross was her business agent, and was shown to have had great influence over her. The evidence as to her sanity was conflicting. The expense of providing for the idiot daughter was shown to have been about $300 00 per annum. The testatrix frequently exhibited the most violent anger towards all her children, without any apparent cause, though she always evinced a desire to provide for her idiot daughter.

The jury having retired to consider of their verdict, and having failed to agree, requested the court to charge them anew on the subject of monomania, for the purpose of satisfying some of them. They returned into the court-room, and the court repeated the language already quoted from his general charge. The jury again retired, and brought in a verdict "that the will of Esther Goldsmith is good and valid."

Counsel for caveatrix moved for a new trial upon grounds embodying the exceptions hereinbefore set out, and upon the allegations of error in the charge, and in the refusals to charge, and in the qualifications of requests to charge, which are here-

inbefore indicated. And upon the further ground that the verdict was against the law and the evidence. The judge refused to grant a new trial upon any or either of the grounds. And to that judgment caveatrix assigns error, and prays that it may be reversed.

JACKSON, LAWTON & BASINGER, for plaintiff in error.

HARTRIDGE & CHISOLM; GEORGE A. MERCER, for defendant.

McCAY, Judge.

As respects the exceptions of the plaintiff in error to the refusal of the judge to charge the jury, upon the effect of certain testimony, and as to the rules for weighing the testimony, we see no serious error. We think the judge was right in refusing to tell the jury that the existence of lunacy in the daughter afforded a violent presumption that the mother was also insane. It was a circumstance to be considered by the jury, and that is all. Perhaps, too, the judge was wrong in saying that such a proposition was contrary to common experience. That, too, was matter for the jury and not for the court. We find no fault either with his refusal to say that if insanity is once proven, it is presumed to continue until its non-existence is made out by proof *equally strong*. All that is true of this proposition is, that insanity once proved is presumed to continue until the contrary state is shown by satisfactory proof. It is not true that such proof must be as strong as was the proof of previous insanity. So, too, in the question of general insanity, the facts *pro* and *con* are positive testimony. If one man sees conduct indicating insanity, and another sees at another time conduct indicating sanity, both witnesses give affirmative testimony. Perhaps, in questions of monomania, as the delusion only developes itself when the subject arises, the witness who sees the party when the subject of the monomania is before him, may be considered as giving positive testimony, whilst one

who only testifies as to the state of the patient's mind, when the subject on which the delusion exists is not present to the mind, may be considered as giving only negative testimony. But the charge was asked on the subject of general insanity. We think, too, that, other things being equal, the jury ought to be governed by the number of the witnesses, and that the court ought to have given the charge as asked. But upon all these points, as to the weight of evidence, and as to the mode of considering it, we should be slow to grant a new trial, unless it was plain that the charge, or failure to charge, misled the jury. These rules are rather rules of philosophy than of law, and are only true in a general sense. It is difficult to find a case where witnesses stand exactly equal in means of knowing, in intelligence and credibility, and if a jury does believe a smaller number of witnesses against a larger, it is almost certain that there is a good reason for it. But we think there were errors of the court on the trial that makes it our duty to reverse his judgment refusing a new trial.

1. We think this was the *probate* of a will in *solemn form* as to Mrs. Evans. It seems to us absurd to say that after all this immense labor the result is only to have the will proven in common form, which the Code says, in terms, is conclusive upon nobody. The petition to the ordinary would have accorded better with the practice in this state had it formally called on the executors to prove the will in common form, though the case of Garther's will, where the motion was exactly like the present, shows that this practice is not uniform. In England the form is very much like that adopted in the present case. It is spoken of as *calling* in *the probate:* See Hayle *vs.* Hasted and Pearson, 6 English E. Reports, 313. And the Code, section 2424, contemplates "setting aside" the probate in common form. We think that when the heir-at-law calls upon the executor to show cause why the probate in common form should not be set aside, and sets forth grounds attacking the integrity and validity of the will, that this is substantially a call for probate in solemn form, and especially is this true if the executor accepts the issue, and undertakes

to prove the will. That all the heirs were not notified is not the fault of the caveatrix. That duty fell upon the executor, and the probate here stands on the footing of any other probate in solemn form when for any reason one at interest is not notified; this often happens. Sometimes an heir-at-law cannot be found; sometimes he is supposed to be dead when he is not. In all such cases the effect is that, however solemn the probate may be, it is still an open question as to all who have had no notice. It will be remembered that our Code, sections 2422, 2430, makes no special provision as to probate in solemn form when there has been a probate in common form. The case provided for is where the executor is the movant. The case of a motion to prove in solemn form after a probate in common form, is left to the proceeding as it was before, regulated by practice of probate courts in England so far as applicable to our circumstances. The course pursued here was very much in conformity to the English practice, as we have seen. It was competent for the executor to have notified all to appear, and had he applied for it, the court would have given as general a scope to the proceeding as he desired. When this will is probated by three witnesses as against Mrs. Evans, she is barred, and she need not care how often the case has to be gone over at the call of others. The prevention of that is the executor's business, and however often he may have it sustained it is still an unproven will as regards heirs not notified. We are not prepared to say, either, that if this verdict stands the will is not set up in solemn form as to all these heirs. All were clearly notified of this proceeding, since all are witnesses before the court, and there is a good deal of authority to the effect that all persons who get notice are barred, whether made formal parties or not: Newell *vs.* Weeks, 1 Eng. Ec. Rep., 239. We are, therefore, of the opinion that the court should have required the propounders to produce all the witnesses to the will, or show a good legal reason why they were not present.

2, 3. We think, too, the court erred in charging the jury that after the *factum* of the will was duly proven the burden

of showing the other requisites ceased as to the propounders, and on the issue of sanity or insanity, undue influence, etc., the burden was on the caveators. We are aware of the fact that there are respectable authorities asserting this rule. It has the countenance of no less an author than Mr. REDFIELD, though he lays it down rather as a logical deduction from certain other rules than as the law. The truth is, the rule is unsettled. The general rule of law undoubtedly is that one is presumed sane until the contrary is shown, and this may also be said of the rule that he who holds the affirmative of a proposition must prove his assertion. But when one comes into a court of justice to give the property of a deceased person a different direction from that given by the law, he takes upon himself to prove all the conditions on which his right depends. In Barry *vs.* Butlin, 1 Cartee's, 637, Mr. Baron PARK, in a case argued before himself, Lord BROUGHAM, Mr. BOSANQUET, justice, and ERSKINE, chief justice, in bank, sitting as a committee of the Privy Council, says: " The strict meaning of the term ' *onus probandi* ' is, that if no evidence is given by the party on whom the burden is cast, the issue must be found against him. In all cases this *onus* is cast upon a party propounding a will. It is in general discharged by *proof of capacity* and the fact of execution." In Harris *vs.* Ingledow, 3 P. Wms., it is said, " The proof of a will is attended with more solemnity than a deed, and, therefore, in equity, in the case of a will, it is always necessary to prove the sanity of the testator. In Gerrish *vs.* Nasson, 22 Maine, 438, 441, the chief justice says, " the power to make wills, and the manner of making them, depends upon certain statutory provisions, one of which is that the testator be of sound mind. The presumption that the person making a will was at the time of sound mind, is not the same as in the case of making other instruments, but the sanity must be proved." In Connecticut this same rule is laid down: 8 Connecticut, 261. So in Tuff *vs.* Hasmer, 14 Michigan. Mr. Baron PARK, in the case of Barry *vs.* Butlin, 1 Cartee's, 638, above referred to, says, " the rules are two: 1st. That the

Evans *vs.* Arnold *et al.*

*onus probandi* lies in every case upon the party propounding the will, and he must satisfy the conscience of the court that the instrument so propounded is the last will of a free and capable testator." And this rule is elaborately established in Crowninshield *vs.* Crowninshield, 2 Gray, 524: See also the case of Delafield *vs.* Parish, 22 New York Court of Appeals, page 9. Indeed, whilst there seems to be some diversity as to what rule shall *control the mind* in deciding the question, even Mr. REDFIELD admits that the practice is almost universal to require the propounders to examine the witnesses as to the question of capacity and freedom. And this has, so far as we know, always been the rule in this state. In *Potts vs. House*, 6 *Georgia*, 334, which was a case most laboriously argued, and has been a leading case on wills in this state, one of the points made and decided was, upon whom, on an appeal, does the "*onus probandi*" rest in an issue of *devisavit vel non;* and then, too, the great issue was the capacity of the testator, and on this point, Judge LUMPKIN delivering the opinion, says: "They (the propounders) must not only prove that the instrument purporting to be a testamentary paper was formally executed, but that the testator was of sound and disposing mind." The practice is to put the witnesses upon the stand to ask them as to the execution, and then to ask questions bringing forward the state of the testator's capacity.

I am not, myself, prepared to say that the general doctrine of the law as to sanity is to be entirely disregarded. Undoubtedly sanity is the normal condition of man, and if, on an examination of the circumstances attending the execution nothing unusual appear; if the testator appear to be aware of what he is doing, and acts as sane men do, I am of the opinion that a *prima facie* case is made out, at least that a verdict for the will would be justified, if, when the facts are detailed, the act as done is done as sane men do things—as if a man ask a witness to attest his will, and the witness do so on its being signed by the testator—the very act of signing, intelligently, is a sane act. Unless, indeed, it appear that the testator was previously insane, when the other rule, to-wit:

the presumption of the continuance of the same condition would doubtless require something more than a sane act at a particular period.   Still the rule is undoubted, that it is a part of the propounder's case to prove the sanity and freedom of the testator, and unless the jury be affirmatively satisfied that the testator was of sound and disposing mind, they should find against the will.   We do not mean, however, to lay down any rule as to the amount of evidence, as that is with the jury. All we intend to say is that the burden is on the propounders to satisfy the jury, as a fact, that the testator was sane and free.

4.  It was, in our judgment, a serious error in the judge to charge the jury as he did, with regard to the effect to be given by them in their consideration of the case to the dispositions of the will, and to say to them that if the desire to provide for the poor child who gets a life estate under the will was a natural and just one, it was no concern of theirs to enquire whether the mode she took was a wise and proper one.

The general rule in questions of the character made by this record, the reasonableness or unreasonableness of the dispositions of the will is a prime element for consideration :  Clark *vs.* Fisher, 1 Paige, 171.   And such is undoubtedly the rule of common sense and just reasoning.   We judge men just this way in all the issues of life—an insane act is proof of an insane mind; an unreasonable, foolish act, is the ordinary and usual proof of a disturbed mind.   And this rule seems in a general way to be admitted by the charge.   But the qualification put upon it, as it seems to us, takes away its whole effect.   "Although the testatrix was a monomaniac as to her excluded children, even then, if her desire to provide for the idiot child be natural, the mode she takes to provide for that child, however foolish, unreasonable, insane it may be, is not for your consideration."   Why not?   If the provision itself be a foolish and unnatural one; if it puts this very darling in strange hands and under unnatural influences, if the very provision be itself an unreasonable and unnatural act.

We do not intend to pass upon the weight to be given to

the dispositions of this will; we only say that it was error to withdraw from the jury the consideration of the striking fact that the property of the testatrix, by the very terms of even this provision, for this sole blood kin, goes to strangers, to the exclusion of her children.

Judgment reversed.