EHLERS *v.* RHEINBERGER.
RHEINBERGER *v.* EHLERS.

Nos. 16296, 16298.   SEPTEMBER 7, 1948.

*John M. Slaton, John H. Hudson,* and *J. Walter LeCraw,* for plaintiff in error.

*Walter A. Sims, Joseph S. Crespi,* and *Harold Sheats,* contra.

JENKINS, Chief Justice. ■ On the main bill of exceptions, the propounder complains of the verdict and judgment finding against the validity of the codicil. Whereas, on the cross-bill of exceptions, the caveatrix complains of the directed verdict in favor of the will. The first question for determination in this connection is whether or not the propounder has carried the burden of prov-

ing the formal execution of the two instruments. The law upon this subject is: "On the trial of an issue arising upon the propounding of a will and a caveat thereto, the burden, in the first instance, is on the propounder to make out a prima facie case, by showing the factum of the will, and that at the time of its execution the testator apparently had sufficient mental capacity to make it, and, in making it, acted freely and voluntarily." *Spivey* v. *Spivey*, 202 *Ga.* 644 (44 S. E. 2d, 224). To make out a prima facie case, and to be entitled to a judgment of probate in solemn form, the propounder must introduce at the hearing all the subscribing witnesses, if living and accessible, or proof of their signatures, if dead or inaccessible. Code, § 113-602. In dealing with the proof necessary to shift the burden to the caveator, this court has said in *Thompson* v. *Davitte*, 59 *Ga.* 472, 475: "The truth is, that what the propounders have to carry, on the score of sanity and freedom, is more in the nature of ballast than of cargo. It is just burden enough to sail with—no more." And in *Evans* v. *Arnold*, 52 *Ga.* 169, 181, this court said: "Undoubtedly sanity is the normal condition of man, and if, on an examination of the circumstances attending the execution, nothing unusual appear; if the testator appears to be aware of what he is doing, and acts as sane men do, I am of the opinion that a prima facie case is made out, at least that a verdict for the will would be justified, if, when the facts are detailed, the act as done is done as sane men do things—as if a man asked a witness to attest his will, and the witness do so on its being signed by the testator—the very act of signing, intelligently, is a sane act."

Since the issues as to the validity of both the will and codicil were tried together, we shall set out the evidence with respect to the execution of both instruments. The uncontradicted evidence with respect to the execution of the will is that, on April 15, 1933, C. J. Rheinberger, a machinist working at the Southern Railroad shops in Atlanta, walked into the ordinary's office in the Fulton County courthouse alone, and asked his friend, Arthur Marbut (now deceased) to witness his will. Mr. Marbut called Mrs. L. D. Portwood (now Mrs. F. J. Jackson) and Mrs. V. J. Brown, who together with Mr. Marbut constituted the three witnesses to the will. Mr. Rheinberger signed in the presence of these witnesses, and they signed as witnesses to it, in the presence of

each other and in the presence of and at the request of the testator. The witness Mrs. Jackson testified: "At this late date I do not remember any conversation that took place other than his asking us to sign his will as a witness." She identified as genuine the signature of Mr. Marbut, and testified that he died about 1934. She identified as genuine the signature of Mrs. Brown, and testified that Mrs. Brown had been living in Jacksonville, Florida, for a number of years. She further testified that Mr. Rheinberger "was apparently in possession of normal faculties." The testimony as to the execution of the codicil is that some three years after the execution of the will the testator came to the ordinary's office again, and asked H. T. Kemp and others to witness his signing. All three of the witnesses to the codicil testified that the testator was apparently in possession of his normal faculties. Mr. Kemp, the only witness who had known the testator previously, testified that he had known him for many years as a machinist at the Southern Railroad shops, and that he was "a person of sound mind at that time." There was further testimony with respect to the soundness of mind of the testator, in substance as follows: Nelson Crist testified that he had come in contact with the testator over a period of many years, mostly in the Battle Hill Lodge room, including the years 1933 - 1936, and that Mr. Rheinberger was "to all appearances of sound mind." Charles D. Clarke testified that he is president of the American Savings Bank, and that C. J. Rheinberger became a director of that bank in January, 1936, and remained on the board of directors through 1941; that Rheinberger was present at almost every meeting and was active as a director; that he served on the real-estate committee of the board of directors and as such would discuss and go over the real estate with the committee each month; that he knew the testator even after he went off the board of directors in 1941, and that during all this time he was, in the witness's opinion, a man of sound mind. "I would say he was a strong-minded man; a person of strong mind, he had very definite ideas of what he wanted."

Under the law and evidence, as above set forth, we conclude that the propounder, by establishing the factum of the will and codicil and by proof of the attendant circumstances indicating mental capacity and freedom of will and action, succeeded in

making out a prima facie case for the validity of the will and codicil such as would shift the burden upon the caveatrix to show that the instruments were invalid by reason of a degree of undue influence exercised upon the testator, such as would deprive him of his own free will and substitute therefor that of the beneficiary.

■ It is the contention of the caveatrix that the evidence adduced upon the trial was sufficient to overcome the presumption of validity raised by proof of the formal execution of the will and codicil, and that the trial court therefore improperly directed a verdict in favor of the will, and properly submitted the issue as to the codicil to the jury, and that the jury was authorized to find against its validity. On the other hand, the propounder contends that the trial court properly directed a verdict in favor of the will, and improperly submitted to the jury the question as to the validity of the codicil, because the evidence demanded a verdict in its favor also. Before taking up these contentions, we deem it advisable to set out briefly the pertinent principles of law relating to the subject of undue influence, by which the evidence may be tested.

It is provided by the Code, § 113-208: "The very nature of a will requires that it should be freely and voluntarily executed; hence, anything which destroys this freedom of volition invalidates a will; such as fraudulent practices upon testator's fears, affections, or sympathies, duress or any undue influence, whereby the will of another is substituted for the wishes of the testator." In *Bohler* v. *Hicks,* 120 *Ga.* 801 (48 S. E. 306), it was said, "Undue influence which operates to invalidate a will is such influence as amounts either to deception or to force and coercion, destroying free agency." In this connection it has been held: "Honest persuasion to make a will of a certain kind, though constant and importunate and though accompanied by tears and entreaties, does not constitute undue influence, in the absence of fraud or duress . . provided the testator is in a mental condition to make a choice between following his original intention or of yielding his view in favor of the wishes of the other person." *Boland* v. *Aycock,* 191 *Ga.* 327 (12 S. E. 2d, 319). See also *Ward* v. *Morris,* 153 *Ga.* 421 (112 S. E. 719). Furthermore, "A person standing in confidential relation to another is not prohibited from exercising any influence whatever to obtain a benefit to himself.

The influence must be what the law regards as undue influence. Such influence that is obtained by flattery, importunity, superiority of will, mind, or character, which would give dominion over the will to such an extent as to destroy free agency, or constrain one to do against his will what he is unable to refuse. Such is the kind of influence which the law condemns as undue." *De-Nieff* v. *Howell*, 138 *Ga.* 248 (75 S. E. 202). Under the above principles of law, it follows that "Undue influence, to invalidate a will, must be operative on the mind of the testator *at the very time the will was executed*, though, to ascertain whether this was so, the state of things both before and after may be regarded." (Italics ours.) *Brown* v. *Kendrick*, 163 *Ga.* 149, 168, 169 (12) (135 S. E. 721); *Boland* v. *Aycock*, 191 *Ga.* 327 (12 S. E. 2d, 319); *Thompson* v. *Davitte*, 59 *Ga.* 472 (3).

Turning now to the evidence in order that we may test it by the above principles of law, it is necessary to bear in mind that the evidence relied upon by counsel for the caveatrix to show undue influence is the same with respect to the execution of the codicil and with respect to the execution of the will, and for this reason it is required that we consider the evidence presented by the entire record. However, the record is so voluminous we feel that neither the purpose of clarity or understanding could be served by undertaking to reproduce any substantial portion of the testimony here; and since counsel for the caveatrix has referred to and commented in his brief on numerous portions which he contends illustrate undue influence, and which he contends sustain his contention that the jury was properly permitted to determine the issue as to the validity of both the will and the codicil, and since from a review of the whole testimony we are of the opinion that counsel has set out the strongest and most favorable evidence, and has drawn the most favorable deductions and inferences therefrom, we shall here state his contentions with respect to such testimony and add only such other evidence in connection therewith as is deemed necessary to give a clear understanding of the evidence itself and the rulings made with respect to it.

These contentions are set out by counsel for the caveatrix in numbered paragraphs as follows: "1. Although it is shown by the evidence that C. J. Rheinberger [testator] had a safe deposit

box in which he kept his valuable papers, the will was found in the possession of the propounder, and was filed in the ordinary's office the day of the death of C. J. Rheinberger. It is also a matter of evidence that the propounder did not even look in the safe deposit box for a will of more recent date, but was so certain that the alleged will in her possession was the only instrument of its kind that she did not bother to examine the contents of the safe deposit box, although she had the key and the right' of entry therein." In this connection it is only necessary to point out that the will was executed in 1933, the codicil in 1936, and that the testator died in 1945; and since the law imposes upon one in possession of what purports to be a last will the duty to submit it for probate, the fact that the propounder may have done so sooner than what might seem appropriate under the proprieties, this can not be said to have any bearing upon the question as to whether or not the instrument was procured under undue influence at the time of its execution in 1933, or in 1936 when the codicil was executed. Nor can any inference of undue influence be drawn from the other matters just referred to.

The next two contentions will be dealt with together. "2. C. J. Rheinberger [testator] was represented by a lawyer, but his lawyer did not know of the existence of a will. Other documents pertaining to the business affairs of C. J. Rheinberger were drawn in legal manner, but the alleged will, the most important document of all, was drawn with pen and ink, allegedly in his own handwriting. Although Mr. Rheinberger was a man who had little, if any, knowledge of legal verbiage, the will contains legal terms which most likely would be known only to, a person experienced in legal documents. The propounder and person alleged to have exercised undue influence on C. J. Rheinberger was a person who possessed such knowledge." That the evidence shows the will was drawn in the handwriting of the testator certainly affords no reason against its being his own act and intention. No reason is shown why the lawyer who had represented him in some previous litigation should have known of the existence of such will. Therefore we can not see how this fact illustrates or has any bearing upon the question of undue influence exercised by the propounder upon the testator. Nor do we think that the evidence sustains the conclusion that the testator "had little, if

any, knowledge of legal verbiage," since it appears that he was an active director in the American Savings Bank, and had been engaged in considerable litigation before and after the execution of both the will and the codicil. But regardless of this, the fact that the will contained some "legal verbiage," together with the fact that the propounder, who is the principal beneficiary, may also have had an understanding of the meaning of such terms, would not authorize the conclusion that the beneficiary had deprived the testator of his own free will in the execution of the will or codicil, or in the disposition of the property therein made.

The fourth and seventh contentions of the caveatrix, being closely related in subject-matter, will be dealt with together. 4, 7. "The will is unfair in its disposition of the property of C. J. Rheinberger, since it disposes of an estate valued at thousands of dollars, and places the control thereof in the hands of a person, Mrs. Ehlers, who at the time of making the will had rendered scant, if any, service to C. J. Rheinberger. For this service she had been paid. The relationship between C. J. Rheinberger and Mrs. Lula Rice Ehlers was closer than that of employer and employee, as evidenced by the testimony of Mrs. Ehlers. Furthermore, Mrs. Ehlers was inexperienced in business, and it was not likely that she could have performed any legitimate service to Mr. Rheinberger which would have warranted the consideration which she received under his alleged will." The only testimony on the points here raised is that of Mrs. Ehlers herself, who testified that business transactions between herself and the testator began in 1932, at which time the testator was regularly employed as a machinist at the Southern Railroad shops, and that the testator had said that he did not have time to attend to all the business matters required of him, and asked the propounder to help him look after the collection of his rents and other business matters. This the propounder did, at first on a part-time basis. She further testified that, after this arrangement had been in effect for some time, the testator brought to her his will on or about the date of its execution, April 15, 1933, and said to her that, if he salvaged one thing out of what he had, he would want her to have it. It will be seen, therefore, that while, at the time the will was executed, the propounder had rendered only

slight service to the testator, nevertheless it must be remembered that the right of a person to make his will so as to constitute a means of providing for his care and sustenance in old age or illness has been specifically recognized by this court in *Brumbelow* v. *Hopkins,* 197 *Ga.* 247 (3) (29 S. E. 2d, 42). Furthermore, it can not be said that the fact that the beneficiary had not rendered services at the time the will was executed comparable in value to the devise would be in the least indicative that the beneficiary had exercised undue influence upon the testator. Particularly is this true where, as here, the evidence discloses that the beneficiary many years later, in 1938 and up until the time of the testator's death, did in fact care for and nurse the testator during his extended illness, such as might reasonably have been contemplated by the testator when he executed his will and codicil.

Counsel for the caveatrix further contends: "5. The principal beneficiary of the will occupied a fiduciary relation to C. J. Rheinberger. This relation was, first, that of a nurse and housekeeper, and second, that of a 'spiritual adviser,' to use the phrase which she herself has used. Furthermore, she held a power of attorney from C. J. Rheinberger, which enabled her to handle all of his affairs." This contention overlooks the element of time, since the propounder did not become nurse and housekeeper for the testator, nor receive power of attorney from him, until 1938, some five years after the will was executed and some two years after the codicil was executed. Further clarifying the propounder's actual testimony with respect to her duties, she stated: "I nursed him and planned for him, gave him my moral support and spiritual advice if I could and I helped him in every way that I could." The circumstances here referred to, arising after the testator had been stricken with serious illness, but some five years subsequent to the making of the will and some two years after the signing of the codicil, are therefore wholly inadequate to show undue influence by the propounder upon the testator at the time the will and codicil were executed.

Paragraphs six, nine, and ten, of counsel's contentions are as follows: "It was pointed out by the evidence that C. J. Rheinberger had been involved in difficulties with his property by women whom he had trusted. The testimony of J. D. Childree to the effect that Mr. Rheinberger expressed annoyance and re-

sentment at the attitude and influence of 'women' (the 'women' referred to were undoubtedly Mrs. Ehlers, her friend, Mrs. Elizabeth Morrison), and Mrs. Ehlers as saying that 'she, Mrs. Ehlers, had considered marrying Mr. Rheinberger in order to get his property.'" The fact that the testator had had difficulties with his property with other women can not be considered as having any bearing on whether or not the propounder, a person wholly disconnected, had used undue influence upon the testator to execute his will. The other testimony is subject to the same criticism, and is also inadequate as tending to show undue influence at the time the will and codicil were executed, because it relates to events transpiring after their execution.

Counsel further contends in paragraphs eight, eleven, and fourteen: "Mr. Rheinberger's age and physical characteristics placed him in the position of one who could easily be influenced. He was subject to spells, falling unconscious on occasion. The testimony of Mrs. Landrum to the effect that Mrs. Ehlers was a 'person of vigorous and strong personality,' as contrasted with the retiring nature and feeble health of Mr. C. J. Rheinberger, who had epilepsy. The domination by and the dominant position which Mrs. Ehlers occupied in the life of C. J. Rheinberger, evidenced by the fact that she promised to give away his automobile to the witness, Mrs. G. L. Landrum, and also as evidenced by the testimony of J. D. Childree to the effect that Mr. Rheinberger warned him not to talk over the phone unless he (Rheinberger) answered the phone, but on the other hand, to hang up if a woman answered the phone." The evidence shows that the testator was only 57 years old when he executed the original will, and exactly 61 years old when he executed the codicil. Also, there is no evidence of physical impairment in 1933 when the will was signed, or in 1936 when the codicil was executed; and it was not until 1938 that the evidence shows he had his first "spell," falling unconscious at his work, and his second spell a month later, which resulted in his retirement from his regular employment. Nor do we think that the tesitmony is susceptible to the construction that the testator could be easily influenced, but on the contrary, the evidence with respect to the testator's susceptibility to influence at and before the time of the execution of both the will and the codicil indicates that he was "a strong-minded

man" and that "he had very definite ideas of what he wanted." Furthermore, the evidence shows that the testator became a director of a prominent bank during the very year when the codicil was executed, and that he functioned actively as such until 1941.

Paragraph twelve of counsel's contention is: "The testimony of J. D. Childree to the effect that Mr. Rheinberger told him that his niece, the caveatrix, would receive all of his property at the time of his death." The statement above referred to would seem to have been taken from its context and is explained when this same witness testified further, "It is correct that he said that his niece was the only living relative that he had to give his property to, but that Mrs. Ehlers must be paid off for taking care of him; and that he didn't know how long he might get down sick and did not know how long that might be." The above testimony when taken together, instead of indicating undue influence exercised by the propounder, seems to illustrate instead that the testator, while being aware that his niece was the "only living relative that he had to give his property to," was at the same time conscious of an obligation to Mrs. Ehlers, the propounder, for taking care of him. It does not in any sense tend to show that the propounder did in fact exercise undue influence upon the testator.

The next contention is: "13. The eccentricities of C. J. Rheinberger, including his attachment for T-model Fords, of which he had three." While we are unwilling to say that the mere fact of ownership of three T-model Ford automobiles constitutes an eccentricity, yet even if it could be said that any other of the evidence as to the habits and characteristics of the testator is susceptible to the inference of eccentricity, still, as stated by the Code, § 113-205, "Eccentricity of habit or thought does not deprive a person of the power of making a will." Nor does the evidence here relied on even faintly suggest that the beneficiary had substituted her will for that of the testator in the disposition of his property as made by his will.

Counsel further contends in paragraph fifteen: "Last, but of potency equal to any other consideration, is the fact that Mrs. Ehlers admitted that the alleged will had been shown to her on or about the date of its alleged execution. She further admitted that she commented on the will and stated that it would have

been better had Mr. Rheinberger made a specific bequest in favor of his niece, instead of the actual language which he used. The evidence shows without contradiction that at a later date he followed her 'suggestion' almost verbatim, showing conclusively that in the execution of the codicil he was acting under' her direction. This consideration, we submit, shows the influence which she had over him, which influence was in effect on the very date of the execution of the alleged will." The inference drawn by counsel from the above-referred-to evidence is that the influence which the propounder is alleged to have exercised upon the testator in the procurement of the codicil related back to the time when the will was executed, some three years earlier. We do not agree that this evidence is subject to such an inference. First of all, the fact that the testator did in fact add a codicil to his will, which in effect met the objection raised by the principal beneficiary, does not, in the absence of any evidence that the beneficiary ever requested the change, or in any other manner sought to influence the testator to make the change, constitute evidence of undue influence. Nor are we prepared to say that a mere natural expression of opinion on the part of the principal beneficiary that she thought it would be better for the testator to himself make any desired provision for his niece, rather than leave any such provision for her, the principal beneficiary, to decide, indicates anything of a derogatory nature on her part.

Construing all of the evidence in the light most favorable to the caveatrix, we are forced to the conclusion that the very most which can possibly be said is that the beneficiary might have had an opportunity to seek to influence the testator; but the evidence falls short of showing that any undue influence was actually exerted at any time, and more especially at the time when the will and codicil were executed, since practically all of the testimony relates to conduct and events occurring long subsequently to their execution. While the inference might be drawn that the propounder occupied a confidential relationship to the testator after both the will and codicil had been executed, evidence which merely shows an opportunity to exert undue influence by one who occupies a confidential relationship to the testator, and who receives a substantial benefit under the instrument sought to be propounded, is insufficient to prove actual

undue influence. *Norman* v. *Hubbard,* 203 *Ga.* 530 (47 S. E. 2d, 574) ; *Brumbelow* v. *Hopkins,* 197 *Ga.* 247 (29 S. E. 2d, 42). Accordingly, under the foregoing rulings, the propounder, having established by proof formal execution under circumstances tending to show competency and freedom of will and action on the part of the testator, made out a prima facie case for the validity of the will and codicil; and since the evidence .relied upon by the caveatrix was wholly inadequate in law to show actual undue influence in the procurement of either the will or the codicil, it follows that the judgment directing a verdict in favor of the validity of the will must be affirmed, while the judgment and decree disallowing probate of the codicil is reversed. Under the above ruling, since the judgment of affirmance would be the same on the bill of exceptions complaining of the directed verdict in favor of the will were this court to dismiss the bill of exceptions upon grounds of procedure which are not raised by counsel, we will therefore not raise any such questions and pass upon them in this opinion. However, since the issue as to the validity of the codicil must be tried again, two errors on the former trial are pointed out, in order that they may not occur again.

■ It was error, and might have been reversible error, to admit evidence, over timely objection, as to the value of the testator's estate as of 1947, for the purpose of illustrating the reasonableness or unreasonableness of an estate devised to the propounder in 1933. Clearly, without any other evidence on the subject connecting the relative values, the value of the estate in 1947 could not be taken to represent its value in 1933 when the will was executed, or the value of the estate in 1936 when the codicil was executed. It is the size and value of the estate when the instrument under attack was executed which can be the only proper subject of inquiry for the purpose of consideration by the jury on the question of undue influence.

■ The trial court was also inaccurate in charging: "If you set aside the codicil, then the terms of the will, which provided that she [caveatrix] should be taken care of, would be the effect of the legal situation at this time." The will actually devised the property outright to the propounder with the provision, "knowing full well that she [propounder] will provide and care for my niece, Willie May Rheinberger, *as she sees fit.*" (Italics ours.)

It will readily be seen that the charge is not an accurate statement of this provision of the will, but is a construction such as might reasonably have influenced the jury to the injury of the propounder.

*Judgment affirmed in case No. 16298; reversed in case No. 16296. All the Justices concur, except Bell, Justice, absent on account of illness.*